IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

*FILED*

*2018 JAN -5 PH 4: 00*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ELBA LUZ DOMINGUEZ-PORTILLO | ) | NOS: EP-17-MJ-4409-MAT |
| MAYNOR ALONSO CLAUDINO LOPEZ | ) | EP-17-MJ-4456-MAT |
| JOSE FRANCIS YANES-MANCIA | ) | EP-17-MJ-4461-MAT |
| NATIVIDAD ZAVALA-ZAVALA | ) | EP-17-MJ-4462-MAT |
| BLANCA NIEVE VASQUEZ-HERNANDEZ | ) | EP-17-MJ-4499-MAT |

## <u>OPINION</u>

Before the Court is Defendants' Motion to Dismiss (ECF No. 13)[1] filed by Defendants on November 7, 2017, in the above-styled and numbered cases. On November 20, 2017, the Government filed its Response in Opposition to Defendants' Motion to Dismiss ("Response") and the Court's November 2, 2017 Order (ECF No. 17).[2] The Court held an evidentiary hearing regarding the present motion to dismiss on November 27, 2017. Upon consideration of the motion, Response, and oral argument, the Court **DENIES** Defendants' Motion to Dismiss (ECF No. 13).

### I.    FACTS & PROCEDURAL HISTORY

These five cases, which have been consolidated solely for the purpose of the present motion to dismiss,[3] all involve allegations that each of the Defendants illegally crossed the border with a juvenile who they allege is their child or, in the case of Defendant Natividad

---

[1] Docket entry citations will refer to the docket in *United States v. Dominguez-Portillo*, No. 3:17-mj-4409-MAT (W.D. Tex.), which is representative of the procedural history of all five cases, unless otherwise specified.

[2] On November 2, 2017, the Court issued a briefing order (ECF No. 3) for these cases requesting that the parties address specific legal questions concerning the lack of information provided to defendant-parents prosecuted for illegal entry under 8 U.S.C. §1325 regarding their minor family members from whom they were separated at the time of their arrest, and resulting in the minors' designation as unaccompanied minors.

[3] These cases were consolidated by an oral order of the Court during the November 1, 2017, hearing.

Zavala-Zavala, grandchild.[4] Defendants were arrested and charged with the petty misdemeanor offense of improper entry by an alien pursuant to 8 U.S.C. § 1325(a)(1).[5] (ECF No. 6). The juveniles accompanying Defendants were separated from Defendants, processed as unaccompanied minors, and transferred to the custody of the Office of Refugee Resettlement ("ORR"). (Res., ECF No. 17, at 3); *see* 6 U.S.C. § 279(g)(2); *see also* 8 U.S.C. § 1232(b)(3).

Defendant Elba Luz Dominguez-Portillo ("Dominguez-Portillo"), who is a citizen of El Salvador, and a juvenile were apprehended on October 21, 2017, by United States Customs and Border Protection ("Border Patrol") while walking on levee road north of the Rio Grande River, approximately 3.89 miles east of the Bridge of the Americas Port of Entry ("Bridge of the Americas"). (3:17-mj-4409-MAT, Compl., ECF No. 6, at 2). During her initial appearance on October 23, 2017, Dominguez-Portillo informed the Court that the juvenile was her sixteen year-old daughter and stated that since the time of their arrest Dominguez-Portillo had not received any paperwork or information concerning the whereabouts or well-being of her minor child. (3:17-mj-4409-MAT, Initial App. Tr., ECF No. 14, at 9).

Defendant Maynor Alonso Claudino Lopez ("Claudino"), who is a citizen of Honduras, and a juvenile were apprehended on October 23, 2017, by Border Patrol while walking eastbound on the north Rio Grande River levee road, approximately 4.6 miles east of the Bridge of the Americas. (3:17-mj-4456-MAT, Compl., ECF No. 6, at 2). During his initial appearance on October 24, 2017, Claudino informed the Court that the juvenile was his eleven year-old son. (3:17-mj-4456-MAT, Initial App. Tr., ECF No. 15, at 12). Claudino stated that since the time of their arrest he had not received any information concerning the whereabouts or well-being of his

---

[4] Although the analysis focuses on the parent-child relationship, it should be equally applicable to a grandparent-grandchild relationship when the location of the parents is unknown, at least in most of the legal discussion below.

[5] Petty offenses are the least serious category federal offenses, and include offenses such as illegal entry (8 U.S.C § 1325), punishable by up to six months in prison, as well as infractions (such as traffic infractions on a federal enclave such as a military base, for example). *See* 18 U.S.C. § 19.

minor child other than being informed by U.S. authorities that his son would be with other children.[6] *Id.*

Defendant Jose Francis Yanes-Mancia ("Yanes-Mancia"), who is a citizen of Honduras, and a juvenile[7] were apprehended on October 22, 2017, by Border Patrol while walking north across the Rio Grande River, approximately 1.46 miles west of the Paso Del Norte Port of Entry ("Paso Del Norte"). (3:17-mj-4461-MAT, Compl., ECF No. 6, at 2). During his initial appearance on October 24, 2017, Yanes-Mancia informed the Court that the juvenile was his fifteen year-old son. (3:17-mj-4461-MAT, Initial App. Tr., ECF No. 14, at 11). Yanes-Mancia stated that since the time of their arrest he had not received any paperwork or information concerning the whereabouts or well-being of his minor child, other than being told that his son would be taken to an institution for children.[8] *Id.*

Defendant Natividad Zavala-Zavala ("Zavala-Zavala"), who is a citizen of Honduras, and a juvenile[9] were apprehended on October 22, 2017, by Border Patrol while crossing the Rio Grande River approximately 1.46 miles west of the Paso Del Norte. (3:17-mj-4462-MAT, Compl., ECF No. 6, at 2). During her initial appearance on October 24, 2017, Zavala-Zavala informed the Court that the juvenile was her seven year-old grandson. (3:17-mj-4462-MAT, Initial App. Tr., ECF No. 14, at 10). Zavala-Zavala stated that she received a piece of paper at the time of her arrest, though she had no idea what it says, and that she had been provided with

---

[6] Claudino was provided with some documents, though he asserts they did not explain how to contact his son. (3:17-mj-4456-MAT, Initial App. Tr., ECF No. 15, at 12). He indicated Government officials also asked him for the address of one of his brothers who lived in Los Angeles, and told Claudino they may be able to send his son to his brother. *Id.* Whether this actually occurred is not in the record.
[7] They were part of a group of fourteen people apprehended. (3:17-mj-4461-MAT, Compl., ECF No. 6, at 2).
[8] Yanes-Mancia further testified that a government official took a document from him that contained the address of his brother who is in the United States, and that he no longer has any way of contacting his brother. (3:17-mj-4461-MAT, Initial App. Tr., ECF No. 14, at 11).
[9] They were part of a group of fourteen people apprehended. (3:17-mj-4462-MAT, Compl., ECF No. 6, at 2).

no further information regarding the whereabouts and well-being of her minor grandson. *Id.* at 10-11.

Defendant Blanca Nieve Vasquez-Hernandez ("Vasquez-Hernandez"), who is a citizen of El Salvador, and a juvenile were apprehended on October 23, 2017, by Border Patrol while walking on the American levee, approximately 1 mile east of the Ysleta Port of Entry. (3:17-mj-4499-MAT, Compl., ECF No. 6, at 2). During her initial appearance on October 26, 2017, Vasquez-Hernandez informed the Court that the juvenile was her thirteen year-old son. (3:17-mj-4499-MAT, Initial App. Tr., ECF No. 14, at 7). Vasquez-Hernandez stated she did not receive any documents relating to her son subsequent to their arrest. *Id.* at 8. She was only told that he would be sent to a camp and that she would learn more information later, though at the time of the initial appearance she had not learned anything further. *Id.* at 7-8.

In a number of recent petty misdemeanor illegal entry cases before this Court over the last several months, the Court has repeatedly been apprised of concerns voiced by defense counsel and by defendants (primarily from Central American nations). The defendants, who claim to be parents of children they were separated from at the time of their arrest, reported to the Court limited and often non-existent lack of information about the well-being and whereabouts of their minor children. Because of the Court's concerns regarding the possible legal impact of these issues on the criminal proceedings of Defendants, the Court ordered briefing to address these novel legal issues.

On November 1, 2017, the Court held a status conference to inform the parties that it was requesting briefing on issues related to their minor relatives. At the hearing, counsel for Defendants informed the Court that he anticipated filing a dispositive motion requesting relief that would address the issues concerning the Court. The Court issued its briefing order (ECF No.

3) the following day, and on November 7, 2017, Defendants filed their Motion to Dismiss. (ECF No. 13). Significantly, neither party presented any witnesses nor evidence during the evidentiary hearing held on November 27, 2017. After allowing for oral arguments by the parties at the evidentiary hearing, the Court denied Defendants' pending motion to dismiss and informed them a written opinion would be forthcoming.

## II.    LAW & ANALYSIS

### A.  Summary of the Parties' Arguments

Defendants argue that their "separation from their minor children during the children's immigration proceedings, and the premature § 1325 charges against them, constitutes a violation of the *Flores Settlement* and, most importantly, a violation of the Due Process Clause with respect to the criminal complaints."[10] (Mot. To Dismiss, ECF No. 13, at 2). They further argue that the separation from the minor children is a form of compulsion that renders their guilty pleas involuntary. Defendants emphasize that they are not asking the Court to analyze the strength of the Government's § 1325 cases against them. Finally, Defendants allege that the Government's actions is in all these regards constitutes outrageous government conduct. As a remedy for these alleged violations, Defendants seek: (1) an expeditious reunion with their minor children pending the resolution of the children's immigration proceedings; and (2) the dismissal of the allegedly premature § 1325 complaints against them.

The Government responds that it has properly charged Defendants with criminal offenses, that the Court has jurisdiction over these offenses, and that Defendants have not raised a legitimate basis for dismissal of these valid charges. They further argue that the *Flores* Settlement has no applicability to criminal cases, and that Defendants have failed to establish any

---

[10] The *Flores* Settlement is a court-approved settlement agreement from 1997, discussed *infra* section E.

Due Process violation.[11] The Government asserts that there has been no coercion, and in fact no guilty pleas have even been entered. Further, the Government argues that even if coercion were proven, the remedy would not be to dismiss the charges, but rather to go to trial. Underpinning these arguments is the Government's assertion that it is not required by law to provide any information regarding the well-being and whereabouts of the minor children of the defendant-parents while the parents' criminal cases are pending.

### B. The Government's Criminal Jurisdiction in These Cases

Title 18 U.S.C. § 3231 provides that the "district courts of the United States shall have original jurisdiction, . . . of all offenses against the laws of the United States." 18 U.S.C. § 3231. Improper entry by means of an improper time or place is a petty misdemeanor federal offense that requires the Government to prove that the defendant: (1) was an alien; (2) who entered or attempted to enter the United States; and (3) entered or attempted to enter at a time or place other than as designated by immigration officers. 8 U.S.C. § 1325(a)(1). The Government must also establish that venue is proper in the Western District of Texas. *See* FED. R. CRIM. P. 18.

Federal Rule of Criminal Procedure 12 provides that a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). A party may argue that a court lacks jurisdiction at any time. *Id.* 12(b)(2). However, the following defenses, objections, and requests must be raised in a pretrial motion if the basis for the motion is then reasonably available and can be determined without a trial on the merits:

A.  a defect in instituting the prosecution, including:
    i.  improper venue;

---

[11] Over the course of the proceedings, the Government has not conceded that the juveniles are even related to Defendants. However, the Government has not provided any evidence to the contrary. As discussed below, the Government, and specifically the ORR, is tasked with making expeditious and accurate determinations of the familial relationships of the unaccompanied minors. *See* ORR Guide, *infra* section F.

     ii.    preindictment delay;

     iii.   a violation of the constitutional right to a speedy trial;

     iv.   selective or vindictive prosecution; and

     v.    an error in the grand-jury proceeding or preliminary hearing;

B.  a defect in the indictment or information, including:

     i.    joining two or more offenses in the same count (duplicity);

     ii.   charging the same offense in more than one count (multiplicity);

     iii.  lack of specificity;

     iv.  improper joinder; and

     v.   failure to state an offense;

C.  suppression of evidence;

D.  severance of charges or defendants under Rule 14; and

E.  discovery under Rule 16

*Id.* 12(b)(3). The phrase "including" in Rule 12(b)(3)(A-B) suggests this list is not exhaustive. Defendants do not specifically assert any of the above defenses, objections, or requests and, if anything, acknowledge that the criminal complaints are properly before the Court and sufficiently plead by emphasizing that they are not asking the Court to analyze the strength of the Government's § 1325 cases against them.

## C. The Outrageous Government Conduct Doctrine

Defendants argue that dismissal is warranted based on outrageous conduct by the Government. The Supreme Court discussed the outrageous government conduct doctrine in *United States v. Russell*, 411 U.S. 423 (1973), and later in *Hampton v. United States*, 425 U.S. 484 (1976). In *Russell*, the Government conduct challenged as outrageous involved a law enforcement official who provided a legally obtainable chemical that was a necessary component to a criminal drug manufacturing enterprise. 411 U.S. at 431-32. The Supreme Court held that a criminal prosecution could nonetheless proceed. *Id.* at 436. While finding the conduct not sufficiently outrageous to warrant dismissal it stated that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a

conviction." *Id.* at 431-32; *see also Hampton*, 425 U.S. at 488-91 (restating *Russell dictum*). While it appears the doctrine is generally considered in the context of entrapment by law enforcement officials, *United States v. Mouton*, No. 11-48, 2013 WL 3187265, at *3 (E.D. La. June 20, 2013), it has been analyzed in contexts not involving entrapment. *See, e.g., United States v. Chavez-Betancourt*, 447 F. App'x 553, 557 (5th Cir. 2011) (analyzing the application of the outrageous government conduct doctrine in a case alleging forgery of a chain of custody receipt by a government official).

"The limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the Defendant." *Hampton*, 425 U.S. at 490. Even then, Government conduct does not warrant dismissal of criminal charges "unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment." *United States v. Posada Carriles*, 541 F.3d 344, 353 (5th Cir. 2008) (quoting *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997)) (internal quotation marks omitted). "However, a due process violation will be found only in the rarest and most outrageous circumstances." *United States v. Nissen*, 928 F.2d 690, 693 (5th Cir. 1991) (citation omitted). The Government's conduct must "shock the most cynical among us." *United States v. Rodriguez*, 603 F. App'x 306, 312 (5th Cir. 2015) (citation omitted). "Thus, a defendant who asserts the defense of outrageous government conduct has an extremely high burden of proof." *Asibor*, 109 F.3d at 1039.

The circumstances warranting the application of the outrageous government conduct doctrine are not generally well-defined by case law. Courts have noted that there appears to be only one circuit court case, *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978),[12] in which a

---

[12] *Twigg* was drug case involving two defendants in a methamphetamine manufacturing operation who did not initially know how to manufacture methamphetamine. The facts showed that, at the behest of the Drug Enforcement

conviction has been invalidated on *Russell-Hampton* grounds. *See United States v. Collins*, 972 F.2d 1385, 1396 n. 10 (5th Cir. 1992); *see also United States v. Valdez*, No. 6:06-60074-07, 2011 WL 7143468, at *50 n. 28 (W.D. La. Dec. 30, 2011), *report and recommendation adopted*, No. 06-60074, 2012 WL 359726 (W.D. La. Jan. 31, 2012). At least one court also questions the continuing validity of the *Russell-Hampton* doctrine. *See Valdez*, 2011 WL 7143468, at *50 n. 28 (collecting cases). The outrageous government conduct doctrine as articulated in these two Supreme Court cases nevertheless remains a recognized doctrine. Significantly, and decisively for the relief sought by Defendants in the instant motion, dismissal on such grounds is an extremely high hurdle which has yet to be reached in any reported Fifth Circuit case.

Thus, the Court must determine whether the Government has violated a protected right of Defendants and, if it has, whether that violation was sufficiently outrageous to warrant a dismissal of the charges, as sought by Defendants.

### D. Parental Rights under the Constitution

Defendants argue that the Government's policy of charging them with § 1325 offenses and separating them from their children runs counter to Supreme Court case law concerning parental rights and an established government preference of considering the release of parents with their children. The Government does not appear to dispute that Defendants have parental rights under the Constitution, but does not articulate what those rights are or recognize that any such rights have been violated. In relation to this argument, it further argues that courts have upheld various conditions of detention against civil challenges.

---

Agency ("DEA") and with its knowledge and significant participation, a cooperating government informant suggested establishment of methamphetamine laboratory; supplied about 20% of necessary glassware for the drug lab; supplied an indispensable chemical component of the drug; made arrangements with chemical supply businesses to facilitate purchase of rest of materials; and purchased almost all supplies. 588 F.2d at 380-81. The DEA also provided an isolated farmhouse for the laboratory. *Id.* at 380. The Court stated "[f]undamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred." *Id.* at 381.

The interest of parents in the care, custody, and control of their children is one of the oldest of the fundamental liberty interests recognized by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights of man,' and '(r)ights far more precious . . . than property rights.'") (internal citations omitted). This liberty interest in the right to familial association is guaranteed by the substantive component of the due process clause of the Fourteenth Amendment. *Troxel*, 530 U.S. at 65-66; *see also Kipps v. Caillier*, 205 F.3d 203, 206 (5th Cir. 2000) (recognizing right to familial association). Although "the parent-child relationship lies at the heart of protected familial associations," *Kipps*, 205 F.3d at 206, the contours of this fundamental right have been described as "nebulous and undefined." *Doe v. Dallas Indep. Sch. Dist.*, 194 F. Supp. 3d 551, 564 (N.D. Tex. 2016) (quoting *Rolen v. City of Brownfield, Tex.*, 182 F. App'x 362, 364 (5th Cir. 2006) (unpublished) (per curiam)).

Furthermore, Defendants argue that the Supreme Court has expressed approval for the principle that parents should generally be considered for release along with their children. In support, Defendants cite the following excerpt from *Reno v. Flores*, 507 U.S. 292, 295 (1993):

> The Board of Immigration Appeals has stated that '[a]n alien generally . . . should not be detained or required to post bond except on a finding that he is a threat to the national security . . . or that he is a poor bail risk.' . . In the case of arrested alien *juveniles*, however, the INS cannot simply send them off into the night on bond or recognizance. The parties to the present suit agree that the Service must assure itself that someone will care for those minors pending resolution of their deportation proceedings. That is easily done when the juvenile's parents have also been detained and the family can be released together[.]

All the parties agree that Defendants have parental rights under the Constitution.[13] Nonetheless, the case law provides little guidance on how such parental rights are actually manifested when a parent charged with a petty misdemeanor illegal entry offense is separated from their child who allegedly accompanied them across the border. If Defendants are in fact separated from their children at the time of their arrest, prohibited from communicating with their children, not given any substantive information about the location and well-being of their children, and effectively barred from participating in their children's immigration proceedings up until the time of their (or their children's) deportation, then Defendants' constitutional rights to familial association may be implicated. However, given the slim records in these cases and the lack of clearly established parental rights in these circumstances and under case law, Defendants have not met the high burden required under the outrageous government conduct doctrine. Inasmuch as Defendants argue *Reno* requires dismissal of the criminal charges, the Court notes that this excerpted language from *Reno* does not mandate release of Defendants or the dismissal of the charges. Thus, the Court concludes that although Defendants enjoy constitutional parental rights, they have failed to provide sufficient evidence demonstrating they are entitled to dismissal under the outrageous government conduct on the grounds of the constitutional right to familial association.

### E. The *Flores* Settlement

Defendants argue that their separation from their minor children during the children's immigration proceedings constitutes a violation of the *Flores* Settlement, and request as a remedy reunification with their children. Specifically, they assert that the *Flores* Settlement

---

[13] *See also* Ice Directive, discussed *infra* section G, which recognizes "[t]he *fundamental rights* of parents to make decisions concerning the care, custody, and control of their minor children without regard to the child's citizenship, as provided for and limited by applicable law. The rights of legal guardians of minor children to make decisions concerning those children as provided for and limited by applicable law." ICE Directive ¶ 3.3 (emphasis added).

provides for (1) "the care of minor children by their parents (when parent and child were simultaneously arrested by immigration authorities) while the resolution of the minor children's immigration proceedings is pending;" and (2) "the possibility of a simultaneous release of the minor child and custodial parent after a bond hearing while the children's immigration proceedings are pending." (Mot. to Dismiss, ECF No. 13, at 4, 6). They further assert that the children have a right to a bond hearing under the *Flores* Settlement, and that this right is implicated in the current proceedings. The Government responds that the *Flores* Settlement is inapposite because it concerns standards for the civil detention of juveniles and not the criminal detention of their parents, and also that it does not apply to the parents of those juveniles.

1. Basic Provisions of the *Flores* Settlement

The *Flores* Settlement is an agreement sanctioned by the United States District Court for the Central District of California in 1997 between the former federal immigration agency, the Immigration and Naturalization Service ("INS"), and a plaintiff class of minors in the custody of immigration officials. The *Flores* Settlement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and [supersedes] all previous INS policies that are inconsistent with the terms of this Agreement." *Flores* Settlement ¶ 9; *see also Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017). The intent of the *Flores* Settlement was to create minimum requirements and guidelines regarding the condition of confinement for juveniles to ensure their well-being and safety. *Walding v. United States*, No. SA-08-CA-124-XR, 2009 WL 890265, at *20 (W.D. Tex. Mar. 30, 2009).

The structure of immigration enforcement departments and agencies was restructured in the wake of the attacks of September 11, 2001. *Bunikyte v. Chertoff*, Nos. A-07-CA-164-SS, A-07-CA-165-SS, A-07-CA-166-SS, 2007 WL 1074070, at *1 (W.D. Tex. Apr. 9 2007). The

*Flores* Settlement is binding on United States Immigration and Customs Enforcement ("ICE"), Department of Homeland Security ("DHS"), and ORR, as successor organizations to INS. *Flores* Settlement ¶ 1; *see also Bunikyte*, 2007 WL 1074070, at *2. Although the *Flores* Settlement was intended as a temporary framework that would only remain in effect until 45 days after the promulgation of final regulations, the Government has never created any regulations. *Sessions*, 862 F.3d at 869. Thus, "the Settlement continues to govern those agencies that now carry out the functions of the former INS." *Id.*; *see also Bunikyte*, 2007 WL 1074070, at *2 ("[I]t appears that *Flores* is the only binding legal standard directly applicable to the detention of minor aliens by the United States government, despite the passage of time and the drastic changes in immigration policy since this judgment was first entered.").

2. The *Flores* Settlement and Parental Involvement with Unaccompanied Minors

Several provisions of the *Flores* Settlement address who minors should be released to and what contact they should have with their parents. Under the Procedures and Temporary Placement Following Arrest heading, the *Flores* Settlement clearly states that facilities holding the minors after arrest "***will provide*** . . . contact with family members who were arrested with the minor." *Flores* Settlement ¶ 12 (emphasis added). This provision is included within a list of requirements that the facilities are required to expeditiously undertake.

In addressing who minors should be released to, the *Flores* Settlement provides that:

14. Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:
  A. a parent;
  B. a legal guardian;
  C. an adult relative (brother, sister, aunt, uncle, or grandparent);
  D. an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being

in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

E.  a licensed program willing to accept legal custody; or

F.  an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

*Id.* ¶ 14. Thus, Paragraph 14 of the Settlement recognizes the parent as the priority above all other possible custodians.

Exhibit 1 of the *Flores* Settlement sets out the "Minimum Standards for Licensed Programs." *Id.* Ex. 1. Licensed programs are required to perform an individualized needs assessment for each minor, which includes gathering "essential data relating to the identification and history of the minor and family; . . . an assessment of family relationships and interaction with adults, peers and authority figures; [and] identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in family reunification." *Id.* Ex. 1 ¶ 3. The Exhibit further mandates that licensed programs provide "[v]isitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation." *Id.* Ex. 1 ¶ 11. Paragraph 18 of the settlement states that:

18.  Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody.

*Id.* ¶ 18. Therefore, family reunification, with a clear preference for custody by a parent, is an immediate and ongoing requirement under the *Flores* Settlement. However, the *Flores* Settlement makes clear that "[n]othing herein shall require the INS to release a minor to any

person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so."[14] *Id.* ¶ 11.

The *Flores* Settlement does not provide that parents are entitled to care for their children if they were simultaneously arrested by immigration authorities,[15] nor does it express a preference for releasing parents charged with criminal offenses. In *Bunikyte v. Chertoff*, a district court in the Western District of Texas found that the *Flores* Settlement did not entitle defendant-parents in custody to be released along with their children. 2007 WL 1074070, at *16-17. In that case, the plaintiffs were minor children who illegally entered the United States with their parents and were being housed alongside their parents in a family detention center. *Id.* at *1. The plaintiffs sought, among other remedies, a preliminary injunction requiring the Government to release their parents from custody pursuant to the *Flores* Settlement. *Id.* at *16. "Though family unification is a stated goal of both the Flores Settlement and U.S. immigration policy generally, nothing in the settlement agreement expresses a preference for releasing parents who have violated immigration laws." *Id.*

The Government does not substantively address the alleged violations of the *Flores* Settlement. Nowhere in its Response does the Government mention the "will provide . . . contact" language from the *Flores* Settlement. The *Flores* Settlement states unambiguously that facilities holding minors "will provide . . . contact with family members who were arrested with the minor." *Flores* Settlement ¶ 12. It further provides for ongoing contact and even visitation if

---

[14] Citing a number of child exploitation prosecutions, the Government argues at length that their policy of providing Defendants no information on their minor children during their prosecution is justified given the risks of possible child exploitation. While child exploitation is an understandably high priority for any prosecutors office, Defendants here are charged, after what one assumes is a thorough review of Border Patrol agents' reports, with quite literally one of the least serious federal offenses, illegal entry under 8 U.S.C. § 1325. It goes without saying that the Government retains and exercises its prosecutorial discretion and prerogative when charging a criminal defendant. Charging a defendant with a petty misdemeanor for illegal entry surely reflects an exercise of this discretion.

[15] Defendants cite an ICE Directive, discussed *infra* section G, in support of this argument, not the *Flores* Settlement.

possible, regardless of the immigration status of the minor's family member. The Government states that this provision, and in fact all of the *Flores* Settlement, exists independently from these cases where the defendant parents are being prosecuted; or simply, the *Flores* Settlement does not apply in the instant petty offense prosecutions. There is nothing in this directive from the *Flores* Settlement that suggests that this provision does *not* apply when the parents are in the custody of the United States, as in the case of Defendants.

*Bunikyte* explains that the *Flores* Settlement "is, in essence, a Court-approved contract binding on ICE and DHS. It is also a court order directing the parties to comply with its terms." 2007 WL 1074070, at *8 (citation omitted). *Bunikyte* observed that "the *Flores* Settlement gives the minor Plaintiffs enforceable rights, but does not create rights in the parents separate from their children's rights." *Id.* at *17. The right to be provided contact with family members who were arrested with the minor is an enforceable right. Under *Bunikyte*, this enforceable right to contact with family members for the child creates an enforceable right in the parents because it is not separate from the children's right. The right of a child to have immediate and ongoing contact with the family member who they were arrested with, regardless of immigration status, is fundamentally inseparable from the corresponding right of that family member to have contact with the child. This is easily distinguishable from the issue in *Bunikyte* in which parents sought release based on the *Flores* Settlement.

The *Flores* Settlement is binding on the Government. The Government has offered no evidence, nor made any reference to, any effort by the ORR, HSI, or ICE to comply with the provisions regarding contact with family members. The only record on the matter is Defendants' unrebutted assertion that they have been given no information regarding the well-being and location of their children.

The practical effect of the Government's non-compliance with this policy in situations like the instant cases is to create a "blackout" period where parent and child are wholly incommunicado from each other while the petty criminal case is pending, which can be for a period of up to six months (the maximum possible sentence for the petty offense of illegal entry). This creates a number of problems in the administration of these misdemeanor cases, as will be discussed below. The Government's response is that "Defendants will have to follow ORR's policies to establish their relationship with the juveniles in order to obtain information about them. Moreover, *the Defendants will be free to pursue whatever immigration relief they wish once their criminal cases are concluded* . . . ." (Resp., ECF No. 17, at 15-16) (emphasis added).

As discussed below, the ORR's policy concession to communication between parent and child is the guarantee outlined on its website that a one-way message from the parent will be delivered to the child, with no provision for a response from the child to the parent. This ORR policy appears irreconcilable with the communication requirements of the *Flores* Settlement. The Court notes that at the time of their parent's arrest, these children are in deportation proceedings or soon will be, without benefit of any communication with their parents. The Government proffers no timetable for when, or even if, a defendant-parent will be allowed to participate in any decisions involving their child's immigration proceedings, stating only that the parent can wait until after they are prosecuted and serve their sentence.

The right to be provided immediate and continued contact with an accompanying relative is an enforceable right clearly outlined in Paragraph 12 and Exhibit 1 of the *Flores* Settlement. The question for Defendants is whether this right is enforceable through the procedural vehicle of a motion to dismiss filed in their petty misdemeanor prosecutions. More specifically, does the Government's noncompliance with this provision of the *Flores* Settlement create the grounds for

dismissal under the outrageous government conduct doctrine? There is no evidence whatsoever of any intent on the part of the Government to purposefully try to coerce a guilty plea or gain a litigation advantage over Defendants by its actions with respect to denying Defendants information on their minor children. Further, nothing suggests that a failure to follow the *Flores* Settlement would give rise to a meritorious claim of outrageous government conduct that would warrant the ultimate sanction for the Government, *i.e.* a dismissal of Defendants' charges. And certainly, this Court has no authority to require the reunification of these family units and mandate Defendants release from custody. The ability of Defendants (or their children) to seek enforcement of the *Flores* Settlement is well beyond the limited scope of this Court's jurisdiction in these misdemeanor prosecutions. Accordingly, Defendants claims in this regard, and the relief they seek, is denied.

### F. ORR Guide

Defendants also argue that charging them with § 1325 offenses and separating them from their children goes against established government intent expressing a preference for keeping the defendant-parent and child together. The Government cites ORR policies in discussing the procedures involving the custody of minor children, and broadly asserts that it properly charged Defendants with criminal offenses.

As discussed above, the Government has not promulgated regulations governing the treatment of detained minors. *See Sessions*, 862 F.3d at 869. However, the ORR published guidelines for the treatment and care of minors in its care. These policies are published on the ORR website and were last updated on January 30, 2015. *See* U.S. Department of Health and Human Services, ORR Guide: Children Entering the United States Unaccompanied ("ORR

Guide").[16] Unlike the *Flores* Settlement, the ORR Guide is subject to revision by the ORR at any time. Nonetheless, as the only source of policies and procedures currently set forth by the ORR, the Court is tasked with determining whether any violation of these policies is sufficient to demonstrate outrageous government conduct.

Absent indications of abuse by the parent, the ORR Guide assumes continued involvement by the parent in the care, custody, and control of the child in ORR custody. The ORR Guide provides numerous references to parental involvement starting at the very outset of the child's detention and separation from their parents by virtue of the parent's arrest.[17] For example, the ORR is required as "a first step" to obtain critical information regarding the child from the referring agency, much of which is sourced from the referring agency's interaction with the parent of the unaccompanied child. ORR Guide § 1.3.1. This is inconsistent with the Government's representations at the evidentiary hearing that no one really knows if these defendant-parents are in fact the parents. Clearly, at least the ORR, if not other agencies, is required to make this determination expeditiously and at the outset of the case. Many of the ORR policies detailed in footnote 15 are dependent on information gathered at the time of the child's apprehension as crucial biographical data is taken at that time. Additionally, the ORR Guide

---

[16] The ORR Guide is available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last visited December 27, 2017).

[17] The following policies contemplate further, ongoing parental involvement. During high influx periods (periods when, generally speaking, the detention centers are exceeding capacity due to a high influx of unaccompanied minors) when a child is placed in a temporary facility, that facility is required to notify the child's parent within twenty-four hours of the child's placement, inform the parent that the placement is temporary, and also inform the parent when the child is transferred to final ORR placement. ORR Guide § 1.7.4. In evaluating potential sponsors for the placement of the child, the facility providing care for the child is directed to employ safe screening methods including "[c]oordination with the unaccompanied alien child's parents, legal guardians, or closest relatives prior to contacting non-relative adult potential sponsors." *Id.* § 2.2.2. When the ORR determines that a Child Advocate is necessary, that Child Advocate is designated to make recommendations regarding the bests interests of the child based on sources such as the child's parents. *Id.* § 2.3.4. For any minor under the age of 14, care providers are required to obtain parental consent to conduct a forensic medical examination when the location of the parent is known. *Id.* § 4.5.2. Care providers are directed to notify the parents of a child who has suffered any type of abuse or neglect, regardless of where it occurred. *Id.* § 5.8.8.

provides a parent or legal guardian with the right to request a bond hearing on behalf of their child in ORR custody. ORR Guide § 2.9.

While these policies clearly contemplate a parent providing information to the ORR at the agency's request in order for the ORR to fulfill its mission, the policies make extremely limited provisions for communication between parent and child. The Court takes judicial notice of a publication entitled "Office of Refugee Resettlement National Call Center", available on the ORR's website.[18] This bilingual handout[19] provides a 1-800 number to a National Call Center run by a contractor. *See* ORR Guide § 1.5. The ORR National Call Center webpage states that for parents and sponsors looking for a child coming to the United States, "We will ensure your message gets to the shelter caring for your child." Section 1.5.1 of the ORR Guide states that once a message is left, and upon verification of an approved contact, "The care provider contacts the individual and informs him/her that the unaccompanied alien child is safe and in ORR custody."

As noted earlier by the Court, this ORR policy appears to be wholly inconsistent with the mandates of the *Flores* Settlement requiring the subject facilities to provide minors with immediate and ongoing contact their family members who were arrested with them. It is difficult to understand how the requirement in Paragraph 12 and Exhibit 1 of the *Flores* Settlement (requiring immediate and continuing contact from the child to arrested family members) can be sufficiently complied with if that "contact" is limited to the promised delivery of a message through a third-party intermediary, with no provision for a return communication from the child. Further yet, it is improbable that meaningful parental assistance and legal coordination could be rendered in a child's asylum claim given the ORR's own impossibly limited parent-child

---

[18] The Office of Refugee Resettlement National Call Center publications are available at https://www.acf.hhs.gov/orr/resource/orr-national-call-center (last visited December 27, 2017).
[19] One PDF is available in English, and another is available in Spanish.

communication policy.[20] Finally, it is difficult to understand how a parent could exercise his or her right to request a bond hearing (as provided by the ORR Guide itself) on behalf of their child with absolutely no information regarding their whereabouts or the status of their child's immigration case.

The question before the Court is limited to whether this separation of parent and child as a result of the Government's policies, such as the ORR Guide, constitutes outrageous government conduct. Because any violations of this policy do not meet the high threshold for such a finding, and because the ORR Guide does not provide parents with legally enforceable rights, any violations of said policy cannot serve as the basis for Defendants' motion to dismiss.

## G. The 2013 ICE Parental Interests Directive

Defendants cite to a directive published by U.S. Immigration and Customs Enforcement ("ICE") as another basis on which the Government's conduct in this cases departs from its own published policies and procedures. The Government responds that the directive is "aspirational" and, in any case, obsolete Government policy not binding on the current administration, and emphasizes that it only applies in a civil context.

On August 23, 2013, ICE published a directive titled "Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities" ("ICE Directive").[21] The ICE Directive defines parental rights as "[t]he *fundamental rights* of parents to make decisions concerning the care, custody, and control of their minor children without regard to the child's citizenship, as provided for and limited by applicable law. The rights of legal guardians of minor children to

---

[20] During the evidentiary hearing and in its Response, the Governments points to its efforts at combatting child exploitation for limiting the information regarding the child to which the defendant-parents are privy. As Judge Sparks remarked in *Bunikyte*, "[t]hough separate detention of minors may have removed some children from dangerous smuggling situations, it often had the effect of splitting up legitimate family groups," and further noted Congress's rejection of such an approach in 2005. 2007 WL 1074070, at *1-2.

[21] The ICE Directive is available at https://www.ice.gov/doclib/detention-reform/pdf/parental_interest_directive_signed.pdf (last visited December 27, 2017).

make decisions concerning those children as provided for and limited by applicable law." ICE Directive ¶ 3.3 (emphasis added). The ICE Directive establishes ICE policy and procedures to address "the placement, monitoring, accommodation, and removal of alien parents or legal guardians who are: 1) primary caretakers of minor children without regard to the dependent's citizenship; . . ." *Id.* ¶ 1. It further mandates that "ICE will maintain a comprehensive process for identifying, placing, monitoring, accommodating, and removing alien parents or legal guardians of minor children while safeguarding their parental rights." *Id.* ¶ 2.

The ICE Directive states "ICE personnel should ensure that the agency's immigration enforcement activities do not unnecessarily disrupt the parental rights of both alien parents or legal guardians of minor children. Particular attention should be paid to immigration enforcement activities involving: 1) parents or legal guardians who are primary caretakers; . . ." *Id.* Far beyond this broad policy language is the ICE Directive's establishment of organizational duties and offices to implement these policies. Specifically, the policy notes that each Enforcement and Removal Operations Field Office Director is to designate a specifically trained Parental Rights Coordinator, tasked with, among other duties, receiving and addressing inquiries regarding to parental rights or family ties of detained alien parents of minor children, and that "[i]nquiries may be received from detained or non-detained aliens, their family members, attorneys or representatives . . . ." *Id.* ¶ 5.1.2. The ICE Directive even addresses when some visitation by the child to the detained parent may be warranted, including by video conferencing to the detention center where the parent is being held. *Id.* ¶ 5.5.

The ICE Directive serves as an important acknowledgement and admission by ICE that parents maintain fundamental rights over their children regardless of immigration status. It makes significant declarations of government policy by recognizing that cases involving minors

present special challenges, in which the rights of the parents are of central concern. Admittedly, the ICE Directive involves civil enforcement of immigration laws, and does not directly discuss its application in criminal prosecutions. The ICE Directive also clearly provides that it does not "create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* ¶ 9.

Still, the Government takes a curious position regarding the ICE Directive, dismissing it as "aspirational" and non-binding on the current administration. As far as the ICE Directive being an aspirational declaration of policy, it imposes on its agency some fairly specific things, including the establishment of local Parental Rights Coordinators and their duties, and goes into detail about issues regarding placement, visitation, and coordination with parents and family. The Government then argues in its Response that the ICE Directive is a legal relic of sorts, an obsolete policy statement by a past administration not binding on the current one. (Resp., ECF No. 17, at 20). As of the date of this Order, however, the ICE Directive has not been rescinded. The directive still appears on the ICE website, a declaration of government policy upon which any reader, anywhere, can rely.

As with the *Flores* Settlement, and in particular its mandate for communication between unaccompanied minor and parent, and the ORR Guide, which clearly contemplates a parental role, the ICE Directive makes yet another statement by an immigration law enforcement agency in which a parental role and the recognition and concern for parental rights in cases involving minor cases is discussed in detail. This is at odds with the Government's contention that no legal authority compels the immigration agencies in misdemeanor criminal cases from having to share any information whatsoever during the pendency of that criminal case. It is not compelled to do

so, and will not do so, according to the Government's Response. This position is inconsistent with the policy ideas expressed in these policies and the legally binding *Flores* Settlement.

Nevertheless, because the ICE Directive, as with the ORR Guide, does not create a legally enforceable right for the defendant-parents, any failure by the Government to comply with it cannot be a sufficient basis for a claim of outrageous government conduct as outlined in *Russell* and *Hampton*.

### H. Premature Charges

Next, Defendants argue that "the § 1325 charges against the parents-defendants are premature and exhibit a violation of due process because these parents-defendants are being deprived of an opportunity to explore and exhaust any administrative remedy they may have with respect to the issue of bond and possible refugee or asylum status." (Mot. to Dismiss, ECF No. 13, at 9). The Government argues that Defendants have been detained on criminal charges with a reasonable bond, and that they can pursue civil remedies at the conclusion of these criminal matters.

According to Defendants, the "Due Process Clause generally forbids detention beyond extremely short periods-usually a matter of days-absent a hearing before a neutral decision-maker to determine whether further confinement is necessary." (Mot. to Dismiss, ECF No. 13, at 9). Defendants were arrested between October 21 and October 23 of 2017 and afforded a bond hearing before the Court between October 23 and October 26. Bond was immediately set at Defendants' initial appearance at $5,000 cash or corporate surety. Inasmuch as Defendants argue that their arrest interferes with their ability to have a bond hearing before an immigration judge, the Court notes that Defendants are sent to immigration centers subsequent to the conclusion of

their criminal cases and nothing legally precludes them from seeking bond from an immigration judge at that time.

Similarly unavailing is Defendants' argument that the criminal charges deprive them of the opportunity to explore and exhaust the possibility of refugee or asylum status. Nothing in 8 U.S.C. § 1325 provides an exception or defense for defendants who may elect to seek refugee or asylum status. Immigration matters, including seeking refugee or asylum status, are civil matters reserved for immigration courts. Notably, Defendants do not cite any authority that stands for the proposition that there is a constitutional or statutory right to exhaust civil immigration remedies before criminal charges can be brought in § 1325 cases. Regardless of any possible merit to the novel arguments raised by the Defendants, it is not the place of this Court to fashion new rights out of whole cloth. The case or controversy before the Court is simply to determine whether Defendants violated § 1325 when they entered the country, and whether there has been, as Defendants allege, outrageous government conduct that prevents prosecution of these alleged offense. Defendants' novel premature prosecution arguments are not supported by law.

## I. Coercion / Involuntary Pleas

Finally, Defendants argue that the Government's practice of: "(1) separating the parents-defendants from their minor children, (2) depriving the parents-defendants of the opportunity to exhaust the possible remedies under the *Flores Settlement*, i.e., bond, refugee, and asylum hearings, and (3) charging the parents-defendants under § 1325 is a 'reasonably calculated [mechanism] to influence the defendants to the point of coercion into entering their pleas of guilty" which violates due process.'" (Mot. to Dismiss, ECF No. 13, at 14). Related to this third claim, Defendants argue that their ability to enter a voluntary plea with knowledge of their immigration consequences as required under *Padilla v. Kentucky*, 559 U.S. 356 (2010), is

"rendered ineffective" because of their limited knowledge of and ability to participate in the immigration proceedings of their children; ergo, they argue, a fully voluntary guilty plea is rendered an impossibility.

The Government argues that not all pressures to plead are considered illegal inducements, and that in particular courts have found that many types of family-related pressures do not rise to the level of coercion. It further notes that Defendants have not pled guilty or attempted to do so. The Government also asserts that even if the aforementioned policies affect Defendants' ability to enter voluntary pleas, the proper remedy is to go to trial, not dismissal of the charges.

The coercion/involuntariness concerns raised by Defendants are readily resolved by the record before the Court. Simply, Defendants did not attempt to plead guilty at any time, and indicated at the status conference and at the evidentiary hearing that they did not intend to change their plea from not guilty to guilty. Further, there is no evidence on the record indicating any government intent to coerce pleas of guilty. Therefore, there is no need to evaluate whether any of the Defendants had involuntary pleas because there were no pleas. The Court agrees with the Government's conclusion that the remedy for a defendant who is unable to plead guilty is to proceed to trial. And for these factual reasons, Defendants' arguments regarding involuntary or coerced guilty pleas are moot.

However, Defendants do raise points which are worthy of discussion, if only to note the Court's disagreement with the Government's reasoning in its broad-brush argument that voluntariness and *Padilla* have no application in these cases or cases like them. In *Padilla*, the Supreme Court found that an attorney's failure to warn a criminal defendant about the immigration consequences of his guilty plea constituted ineffective assistance of counsel. 559 U.S. at 373-75. *Padilla* is a decision regarding ineffective assistance of counsel; it contains a

lengthy and detailed discussion regarding the nature of representing a criminal defendant faced with making informed decisions about his case while considering the potential of severe immigration consequences *and* the possibility of any relief from those consequences. The Court explained that immigration consequences to criminal conviction are unique, noting that "[w]e have long recognized that deportation is a particularly severe 'penalty' . . . but it is not, in a strict sense, a criminal sanction." *Id.* at 365 (citation omitted). The Supreme Court further stated that criminal defendants facing deportation are very likely to be unable to separate these immigration consequences from the criminal conviction. *Id.* at 366. Significantly to the argument made by Defendants, which the Court embraces here, *Padilla* adds that "preserving the possibility of discretionary relief" would be a *critical consideration* for a defendant in deciding whether to plead guilty or proceed trial. *Id.* at 368 (internal quotation marks omitted). "When attorneys know that their clients face possible exile from this country and separation from their families, they should not be encouraged to say nothing at all." *Id.* at 370. The Supreme Court concluded that to not require this of defense counsel "would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available." *Id.* at 370-71.

Every federal court in the country taking a plea of guilty from a non-citizen defendant is now required under Federal Rule of Criminal Procedure 11 to warn a defendant about the immigration consequences of his plea. This Court inquires in every such plea whether the defendant has had enough time to discuss these immigration consequences with his client, and whether the defendant is satisfied with his lawyer's advice and representation in this respect. If *Padilla* stands for anything, it is for the proposition that a defendant's knowledge of the

immigration consequences of his plea matter when a defendant attempts to assess his options in a criminal case.

Like the defendant in *Padilla*, Defendants face immigration consequences in their criminal prosecutions. These cases present the additional complication that the defendants must make these decision without the benefit of knowing anything whatsoever about the legal status of any immigration proceedings for their minor children who accompanied them. *Padilla* states explicitly that the immigration consequences and the possibility of relief from those consequences "would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial." 559 U.S. at 368 (citation omitted). Who can doubt that the immigration consequences and any possibility of seeking legal relief for their minor children who accompanied them would not be a critical, if not determinative, consideration in the Defendants decisions? There is little doubt that the fate of their minor children would be of paramount concern in their calculus. Defendants in the present case are making these decisions in a vacuum, without knowledge of the well-being and location of their children, to say nothing of the immigration proceedings in which those minor children find themselves. Defendants' decisions in their criminal cases, therefore, involve as a practical matter not only their immigration consequences, but those of their children. In making a decision on pleading guilty or going to trial, it is inconceivable that their own immigration consequences would not be completely intertwined with that of their minor children who accompanied them.

A number of such scenarios can easily be surmised for a similarly situated defendant who finds himself incommunicado with his minor child. For example, a defendant facing certain deportation would be unlikely to know whether he might be deported before, simultaneous to, or after their child, or whether they would have the opportunity to even discuss their deportations;

that defendant must make a decision on his criminal case with total uncertainty about this issue. If parent and child are asserting or intending to assert an asylum claim, that child may be navigating those legal waters without the benefit of communication with and assistance from her parent; that defendant, too, must make a decision on his criminal case with total uncertainty about this issue. While the Government may assert that these are considerations that can wait until after the criminal proceeding, it is extremely likely these immigration factors would be critically important to the defendant. It is also highly likely the defendant's counsel would face inquiries in this respect, and would have to apprise his client as required by *Padilla*. Defense counsel, too, would be in the unenviable position of being unable to provide even the most basic information on what could easily be the most important consideration for a defendant such as those in this case.[22]

## J. Voluntariness Under Rule 11

The issue of voluntariness generally, as raised by Defendants, is similar to the analysis regarding the *Padilla* issue, in many respects. The requirements for guilty pleas are outlined in FED. R. CRIM. P. 11. Federal courts are required to determine the voluntariness of a plea pursuant to Rule 11(b)(2). A court is required to make findings in that respect.[23] A guilty plea is "a grave and solemn act to be accepted only with care and discernment." *Brady v. United States*, 397 U.S. 742, 748 (1970). The voluntariness of a plea can only be ascertained by considering all of the relevant circumstances surrounding the plea. A court must develop the record through personal interrogation, to ensure the court's own assessment of the voluntariness of the plea, and also to

---

[22] Nor does the Government describe with any certainty when exactly the mandates of Paragraph 12 of the *Flores* Settlement are triggered after the conclusion of the criminal prosecution. This presumes that these promised procedures are in fact taking place after their prosecution and sentence is concluded.

[23] Rule 11(b)(2) states "Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement)." FED. R. CRIM. P. 11(b)(2).

facilitate a review of the same in a post-conviction setting. *McCarthy v. United States*, 394 U.S. 459, 467 (1969). "The plea must be entered 'voluntarily,' *i.e.*, not be the product of 'actual or threatened physical harm, . . . or of state-induced emotions so intense that the defendant was rendered unable to weigh rationally his options with the help of counsel.'" *Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000) (internal citations omitted). Thus, rather than engaging in a litany or predetermined checklist, a court taking any guilty plea must develop the record in any area of concern that should arise during the plea colloquy. By way of example, when assessing the competency of a defendant where a past history of mental health problems are brought to the court's attention during the plea colloquy, a court acts prudently if it makes detailed inquiries and develops the record more than it ordinarily would. Similarly, if the court inquired about voluntariness and a defendant hesitated or suggested that their plea of guilty was being undertaken for any reason other than that they were guilty of the offense, the court would be duty bound to inquire further to develop the record on this discrepancy.

As discussed earlier, the Government argues, correctly in the opinion of the Court, that the ultimate remedy for the inability of a defendant to voluntarily enter plea of guilty is to proceed to trial; further, none of the Defendants here attempted to plead guilty.[24] In the absence of guilty pleas, the facts are such that the Court can only address some of the issues raised by Defendants in this respect hypothetically. It is clear to the Court that if any similarly-situated defendant raised the concern of their lack of information regarding their minor child during the voluntariness portion of a guilty plea that the Court would have to inquire the defendant and

---

[24] The Government cites a number of cases standing for the proposition that "family-related pressures" on a defendant's guilty plea will not render a plea involuntary. (Resp., ECF No. 17, at 13-14). The Court understands the voluntariness issue raised by Defendants as going hand in hand with the issue as it relates to *Padilla* and their own immigration consequences as they relates to those of their children. To the extent that this issue as raised by Defendants is a matter of first impression, the cases cited by the Government are inapposite to the issue presented by Defendants.

develop the record.[25] In the instant cases, the Government's argument that the child-related issues raised by Defendants can never affect voluntariness and are never relevant is not consistent with the Court's obligations to thoroughly ascertain the facts relevant to guilty plea. The Court is tasked with making these determinations and findings in each and every case, regardless of whether it is a guilty plea in a felony or one of the hundreds of petty misdemeanors it adjudicates every year.

### K. Summary

Defendants, accused of the petty offense of illegal entry, have made novel legal arguments that appear to stem from their understandable concern for their children, and from being completely incommunicado with them while being prosecuted for a very minor offense. The constitutional right to familial association is undisputed by the parties, yet its specific contours and application in these cases is unclear at best, except in the most general sense. This constitutional concept seems to undergird the Government's policies discussed above, which contemplate a parental role in the unaccompanied minor's confinement and proceedings.

Defendants point to the ICE Directive as a detailed policy statement stating a governmental posture towards parents very different than what the Government states is

---

[25] Throughout its Response and during the evidentiary hearing, the Government repeatedly made the claim that the mere mention by Defendants that they were accompanied by a minor child at the time of their arrest - whether done so spontaneously by Defendant, or discussed by counsel at sentencing allocution, or as a result of an inquiry by the Court- is an admission subjecting a defendant to an alien smuggling charge under 8 U.S.C. § 1324. These are facts already known to the Government at the time of arrest of the defense, by operation of their own ORR policies requiring the arresting agency to provide the ORR with information regarding the parents. *See* ORR Guide § 1.3.1(the ORR requests from the referring agency biographical and biometric information, and whether the child was apprehended with a sibling or other relative). Indeed, their own Response, citing the discovery provided by the Government to Defendants, mentions the fact that each Defendant was accompanied by a juvenile. Additionally, two of the complaints mention this fact for those Defendants. The Court maintains that the basic fact that a defendant-parent was accompanied by a minor may be relevant for purposes of a plea, *e.g.,* for purposes of discussing the immigration consequences of a plea and to determine the voluntariness of a plea, and may be relevant as a relevant sentencing factor under 18 U.S.C. § 3553(a)(1). The Government has certainly not sought alien smuggling charges against any of the Defendants here, while having full knowledge from the outset that they were accompanied by a minor child. The mere in-court acknowledgment that a defendant was accompanied by a minor is not a surprise to the Government in any of these cases, and it does not create additional legal exposure for the defendants.

applicable here. The Government points towards the ORR Guide as the only applicable source of any procedure for a similarly-situated parent to obtain information or otherwise participate in an unaccompanied minor's immigration proceeding. Even the ORR policies contemplate a parental role, including a provision for a parent to request a bond hearing for the child. However, the legal viability of the ORR Guide's provision for only a one-way missive from concerned parent to the child's facility through a third-party intermediary is questionable under the *Flores* Settlement. Nevertheless, neither the ICE Directive nor the ORR Guide gives Defendants any actionable rights, and certainly not through the instant motion to dismiss their criminal charges.

It is the Defendants' invocation of the enforceable rights under the *Flores* Settlement, which operates under force of court order and binds all of the INS successor agencies, which presents Defendants' strongest argument. The *Flores* Settlement was created to establish enforceable guidelines in lieu of regulations which have never been promulgated by the federal government. It requires facilities in which unaccompanied children are held to provide immediate and continued contact with family members who were arrested with the minor, regardless of their legal status. The *Bunikyte* court stated that parents have no actionable rights under the *Flores* Settlement, but with the important caveat that this is only to the extent that these rights are separate from those of their children. Nothing in the very limited record before the Court suggests that INS successor agencies – Border Patrol, ICE, and the ORR – are in compliance with the *Flores* Settlement's requirement for immediate and continued contact between child and parent. The core of the Government's position is to unpersuasively argue that the Settlement has no application to defendants being criminally prosecuted. Nothing in the language of the *Flores* Settlement itself, or in any subsequent case law discussing it, suggests any support for this exception the Government attempts to create.

Nonetheless, the Government prevails in its opposition to Defendants' instant motion to dismiss. Any violations by the Government as alleged by Defendants, even if true, do not constitute outrageous government conduct. Further, with regard to the *Flores* Settlement, the Government does not prevail because those rights are unenforceable by these Defendants or their children, but rather because those provisions are not enforceable within the narrow confines of Defendants' motion to dismiss in their criminal cases, which is the only justiciable controversy before the Court.

### III.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 13) is **DENIED**.

**SIGNED and ENTERED** this **5th** day of January, 2018.

MIGUEL A. TORRES
UNITED STATES MAGISTRATE JUDGE